UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
ANGEL R. SASTRE,                        )
                       Plaintiff,       )
                                        )       CIVIL ACTION
            v.                          )       NO. 10-10393-WGY
                                        )
MICHAEL J. ASTRUE,                      )
Commissioner, Social Security           )
Administration,                         )
                       Defendant.       )
_____ )

MEMORANDUM OF DECISION

YOUNG, D.J.                                        June 29, 2012

I.    INTRODUCTION

    The plaintiff, Angel Sastre ("Sastre"), brings this action

pursuant to section 205(g) of the Social Security Act, 42 U.S.C.

§ 405(g), seeking judicial review of the final decision of the

Commissioner of Social Security (the "Commissioner").  Sastre

challenges the decision of the Administrative Law Judge (the

"hearing officer") denying his application for Supplemental

Security Income benefits.  He argues that the Commissioner's

decision was not based on substantial evidence, specifically

claiming that the hearing officer's assessment of his residual

functional capacity was improper because he afforded too little

weight to the opinion of a reviewing physician, improperly

1

discredited Sastre's testimony, and should have found Sastre's depression to be a severe impairment. Mem. Supp. Pl.'s Mot. Reverse Remand Decision Comm'r Soc. Sec. Admin. ("Sastre Mem.") 1, 8, 17, ECF No. 17. Sastre requests that this Court reverse the decision of the Commissioner or remand the case to the Commissioner. Id. at 1. The Commissioner filed a motion for an order affirming his decision. Mem. Supp. Def.'s Mot. Order Affirming Decision Comm'r ("Comm'r Mem."), ECF No. 20.

## A. Procedural Posture

Sastre filed for Supplemental Security Income benefits on March 2, 2007, alleging disability since June 27, 2002. Admin. R. 120. On August 9, 2007, the Commissioner denied Sastre's application. Id. at 73-74. Upon request for reconsideration, Sastre's application was reevaluated and again denied on July 24, 2008. Id. at 67-70. Sastre requested an oral hearing on July 25, 2008, and the hearing took place on August 12, 2009. Id. at 21, 81-83. The hearing officer subsequently issued a decision unfavorable to Sastre on September 29, 2009, stating that Sastre was not disabled within the meaning of the Social Security Act from the alleged onset date through the date of the decision. Id. at 10-20.

The hearing officer's decision was selected for review by the Decision Review Board (the "Board"), but the Board did not complete its review within the prescribed ninety-day period. Id.

at 1-4.  Consequently, the hearing officer's decision became the final decision of the Commissioner.  Id. at 1; see 20 C.F.R. § 405.420(a)(2) (2011)[1].  On March 5, 2010, Sastre filed the present action with this Court to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g).  Compl., ECF No. 1.

### B.  Factual Background

#### 1.  Medical Treatment Records

Sastre was forty-eight years old on the date he submitted his application.  See Admin. R. 120.  He worked as a mechanic in the United States from November 2001 to June 2002 and was previously a mechanic in Puerto Rico for nine years.  Id. at 134, 291.  There is a discrepancy in the record as to the highest grade of school he completed.  See id. at 30, 140 (indicating highest grade completed to be eighth grade and then later twelfth grade).

On May 7, 2002, Sastre sustained a work-related injury that resulted in a hernia.  Id. at 235-36.  Sastre sought treatment for the abdominal pain from his treating physician, Dr. Roberto Feliz ("Dr. Feliz"), on the day the injury occurred.  Id.  Dr. Feliz found that Sastre had a large ventral hernia and referred him for surgery.  Id. at 239.  Due to the anxiety of surgery and

---

[1] Effective June 13, 2011, the Social Security Administration eliminated the Decision Review Board in the Boston region.  Eliminating the Decision Review Board, 76 Fed. Reg. 24,802 (May 3, 2011) (deleting portions of 20 C.F.R. § 405).

wait for approval from his insurance carrier, Sastre did not undergo surgery to repair the hernia, despite Dr. Feliz's advice that failure to have surgery could interfere with his ability to work. See id. at 230-35, 241. Instead, he returned to Dr. Feliz in January 2003 with further complaints of abdominal pain. Id. at 235. In March 2003, Sastre's hernia was reevaluated by a surgeon who reported that the size of the hernia was about seven inches and bulging outward. Id. at 352. A review of the record suggests that Sastre has yet to undergo surgery to repair the hernia.

Sastre continued to report his hernia and abdominal pain during his medical appointments for the next several years and claimed that he could not work because of the hernia. Id. at 304, 339. On December 16, 2004, Dr. Danru Lee ("Dr. Lee") reported that although Sastre did have a large ventral hernia, it was not severe. Id. at 341. Dr. Lee advised that Sastre wear a waist belt and that the injury should not completely limit his physical activity. Id. at 343.

Sastre has also had a long struggle with neck and back pain. He was first diagnosed with degenerative disc disease on March 28, 1996. Id. at 509. During that appointment, a magnetic resonance imaging ("MRI") exam revealed that Sastre had degenerative disc disease at L2-3, L3-4, and L4-5 and a small, left-side disc herniation at L3-4. Id. at 509-10.

During an emergency room visit on December 4, 2005, Sastre complained of neck pain but no neck-related abnormalities were recorded then or at a follow-up appointment with Dr. Lee. Id. at 315-317, 326. Over the next five years, Sastre continued to complain of back and neck pain in his medical appointments. On June 20, 2006 and August 2, 2006, Sastre complained of back pain in two different appointments and imaging showed small spurs about his thoracic spine during a follow-up MRI. Id. at 297, 299, 309.

On March 7, 2007, Sastre visited Dr. Feliz who noted that Sastre showed moderate guarding, tenderness, and stiffness of the cervical spine. Id. at 225-26. With respect to Sastre's lumbar spine, Dr. Feliz noted that there was moderate tenderness along the paraspinal muscles and moderate to severe tenderness from L2 to S1 bilaterally. Id. at 226. Dr. Feliz also noted that Sastre had a limited range of motion on all planes, spasm and an antalgic gait of the lumbar spine, but grossly normal motor and sensory examinations, as well as normal reflexes for both lumbar and cervical examinations. Id. Based on these examination results, Dr. Feliz diagnosed Sastre with cervical IVD degeneration, cervical osteoarthritis, cervical radiculitis, lumbar IVD degeneration, and lumbar facet syndrome. Id. As a result, Dr. Feliz recommended facetal joint injections to ease Sastre's pain and opined that Sastre was temporarily totally

disabled due to neck and back pain.  Id. at 224.

Over the next two years, Sastre periodically met with Dr.
Feliz to address his back and neck pain.  See id. at 207, 214,
217, 475, 479, 481, 485, 497, 501.  During these appointments,
Dr. Feliz noted that Sastre's condition was basically unchanged
until he noted slight improvement in the level of stiffness and
spasm, limping, guarding, and tenderness on November 13, 2007.
See id.  He treated Sastre with facetal joint injections and
recommended in multiple appointments that Sastre remain
physically and mentally active.  Id. at 213, 222, 223, 477, 483,
488, 491, 499, 503.  On May 5, 2007, Dr. Feliz recommended that
Sastre remain working if possible.  Id. at 213.  On May 22, 2008,
Dr. Feliz noted that the examination of Sastre's lumbar spine
showed that there had been moderate improvement in the overall
level of guarding, protecting, and limping.  Id. at 482.  Dr.
Feliz prescribed Percocet for Sastre on April 17, 2007, September
11, 2007, and May 22, 2008.  Id. at 220, 481, 500.  Additionally,
Dr. Feliz prescribed Sastre Phenergan with Codeine on June 20,
2007.  Id. at 209.  After an appointment in January 2009, Dr.
Feliz noted moderate improvement in the cervical spine
examination and that Sastre stated that he felt improved by fifty
percent.  Id. at 473-75.  In February 2009, Sastre's primary care
physician since 2006, Dr. Michael Paasche-Orlow ("Dr. Paasche-
Orlow"), reviewed a MRI taken on January 12, 2009 and noted that

it revealed L4-L5 and L5-S1 disc protrusions without stenosis or impingement.  Id. at 424.

In April 2009, Sastre's back and neck symptoms were exacerbated when he was struck by an automobile.  Id. at 406.  A subsequent x-ray examination revealed mild multilevel degenerative changes in the cervical spine, loss of the normal lumbar lordosis, and facet joint hypertrophy.  Id.  In a follow-up appointment, Dr. Feliz noted that Sastre had generalized stiffness, a moderately limited range of motion in his cervical and lumbar back, and tenderness to palpitation along his cervical trapezius and paraspinalis muscles.  Id. at 470.  Additionally, Dr. Felix noted that Sastre had a mild paraspinal muscle spasm, but a normal motor and sensory exam, normal reflexes, and a negative straight leg test.  Id.  Dr. Feliz advised Sastre to take Motrin to ease the pain and Flexeril, a muscle relaxant. Id. at 471.

On April 30, 2009, Sastre complained of persistent lower back pain and sought injections so he could return to work as a mechanic.  Id. at 450.  Sastre received lumbar paravertebral/joints injections, and a prescription for Vicodin ES.  Id. at 453.  On Jun 5, 2009, he received cervical epidural steroids injections.  Id. at 463.  At that appointment, Dr. Feliz noted prescriptions for Vicodin and Percocet for lower back pain. Id. at 461.  A week later, Sastre received lumbar epidural

steroids injections.  Id. at 459.  On June 19, 2009, Dr. Feliz
noted that Sastre's lower back pain was stable and that his
examination of Sastre's lumbar spine showed significant
improvement in the overall level of guarding, protecting, and
limping.  Id. at 455.  Despite Sastre's noted improvement, Dr.
Feliz opined that Sastre had Advanced Degenerative Cervical
Spondylosis and lumbar discs and facetal osteoarthritis.  Id. at
456.  On July 13, 2009, Dr. Feliz concluded that Sastre had
recovered and was "back to his preinjury physical status."  Id.
at 448.  Dr. Feliz also stated that Sastre experienced a
temporary period of partial disability from April 14, 2009 to
July 13, 2009 from the injuries sustained from the automobile
accident.  Id. at 448-49.  At the time of the appointment,
however, he found no ongoing level of physical disability that
resulted from the April 2009 accident.  Id. at 449.

In addition to neck and back pain, Sastre has also
complained of knee pain for several years.  On March 31, 2003,
Sastre complained of right knee pain from an automobile accident
and a nurse ordered x-rays.  Id. at 357-59.  The x-rays showed no
evidence of fracture or dislocation, but did show a small bone
spur that is consistent with early degenerative change.  Id. at
360.  Three years later, on July 19, 2006, Sastre complained of
right knee pain to Dr. Paasche-Orlow, but Dr. Paasche-Orlow did
not find any laxity, crepitation, erythema, or swelling.  Id. at

304-06. Sastre also complained of pain in both knees to Dr. Feliz on May 08, 2007, January 07, 2008, and April 28, 2008. <u>See</u> <u>id.</u> at 210, 485, 493. On February 11, 2009, Sastre again complained to Dr. Paasche-Orlow of right knee pain. <u>Id.</u> at 422. Dr. Paasche-Orlow prescribed anti-inflammatory medications. <u>Id.</u> at 424.

Sastre reported that his left knee was injured by his April 2009 accident but an x-ray was normal and an examination by Dr. Feliz showed only slight tenderness. <u>Id.</u> at 468-70. Dr. Anthony Schepsis ("Dr. Schepsis"), an orthopedist, subsequently performed an MRI examination on April 22, 2009 that revealed a medial meniscus tear in the right knee consistent with early degenerative change. <u>Id.</u> at 405. Dr. Schepsis recommended that the meniscus tear be repaired with an arthroscopy. <u>Id.</u> On June 19, 2009, Dr. Feliz noted that Sastre's right knee pain was due to advanced osteoarthritis. <u>Id.</u> at 456. Approximately one month later on July 13, 2009, Dr. Feliz noted that Sastre had increased his level of physical activity with minimal pain or discomfort. <u>Id.</u> at 447. Dr. Feliz further noted that Sastre's lower back felt well with the exception of mild residual stiffness. <u>Id.</u> Sastre also denied any neck or back pain and significant left knee pain during that appointment. <u>Id.</u>

In addition to his physical ailments, Sastre also suffers from depression. On October 18, 2006, Dr. Paasche-Orlow opined

that Sastre had depression and insomnia, and prescribed Paxil and
Ambien to remedy the symptoms.  Id. at 293.  In subsequent
appointments over the next year, Dr. Paasche-Orlow and nurse
Susan Morrissey noted that Sastre expressed that he was depressed
and had trouble sleeping.  Id. at 262, 266, 274, 278, 284.
Specifically, on January 25, 2007, Sastre reported that he had
nonspecific suicidal thoughts and requested to see a counselor.
Id. at 274.  Sastre again had nonspecific suicidal thoughts in
March 2007.  Id. at 266.  On April 17, 2007, Sastre reported that
he had anxious feelings and depression to Dr. Feliz.  Id. at 217.
In a series of appointments up until May 22, 2008, however, Dr.
Feliz noted that Sastre's psychiatric evaluation showed that he
had "mood and affect appropriate to the situation."  Id. at 208,
215, 217, 474, 476, 483, 487, 490, 495, 499, 502.

On February 11, 2009, Sastre met with Dr. Paasche-Orlow and
reported depression and anxiety which causes mood swings and
sleep disturbance.  Id. at 422.  Dr. Paasche-Orlow increased
Sastre's dose of Trazodone and Paxil.  Id. at 424.  Two weeks
later, Sastre met with psychiatrist Dr. Katharina Trede ("Dr.
Trede") and he reported, "I am a disaster."  Id. at 386.  Dr.
Trede determined that Sastre had symptoms of severe depression
with an anger management problem and trouble sleeping.  Id. at
390.  Dr. Trede further noted that Sastre felt hopeless,
isolated, and had nothing to do during the day.  Id.  During

three subsequent appointments in April through June of 2009, Dr. Trede noted that Sastre was in better spirits, sleeping more, and evaluated his global assessment of function score to be a 55. Id. at 370-74, 375-79, 381-83.

### 2. Non-Treating Opinion Evidence

On June 7, 2007, Dr. Walter Harrison ("Dr. Harrison") reviewed Sastre's medical records and completed his physical residual functional capacity assessment. Id. at 198-205. Dr. Harrison opined that Sastre occasionally could carry and lift twenty pounds and frequently could lift and carry ten pounds. Id. at 299. He concluded that Sastre could stand and walk for about six hours a day, sit for about six hours a day, but was limited to occasional climbing, balancing, stooping, kneeling, crouching, and crawling. Id. at 199-205.

During a consultative examination on July 3, 2007, Dr. Byron Garcia ("Dr. Garcia"), a psychiatrist for the Massachusetts Rehabilitation Commission, noted that Sastre reported decreased energy, diminished motivation, feelings of sadness, and lack of interest in pastimes or socializing with people. Id. at 241. Dr. Garcia further noted that Sastre did not report feeling worthless or hopeless and that Sastre did not report that he had a passive death wish. Id. He then diagnosed Sastre with a depressive disorder not otherwise specified and gave him a global assessment of function score of 40. Id. at 242.

On November 14, 2008, Dr. Louis Fuchs ("Dr. Fuchs"), a state agency physician, performed a residual functional capacity assessment and opined that Sastre could perform light lifting, by frequently lifting ten pounds and occasionally lifting twenty pounds. Id. at 366-67. Dr. Fuchs's opinion was based on seven examinations of Sastre, ranging from May 2002 to December 2007. Id. at 366. Dr. Fuchs opined that Sastre could only stand and walk for two hours in an eight-hour workday and required a sit/stand option. Id. at 367. Dr. Fuchs's further concluded that, based on the objective medical evidence, Sastre had only slight mental impairments. Id. at 368.

## II. LEGAL STANDARD

### A. Standard of Review

Under 42 U.S.C. § 405(g), a district court has the power to affirm, modify, or reverse a decision of the Commissioner. The district court must make its decision based on the pleadings and transcript of the record before the Commissioner; "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." Id.; see Manso-Pizarro v. Secretary of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996). The First Circuit has clarified this standard as requiring a court to uphold the Commissioner's findings if "a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his

conclusion." Irlanda Ortiz v. Secretary of Health & Human
Servs., 955 F.2d 765, 769 (1st Cir. 1991) (quoting Rodriguez v.
Secretary of Health & Human Servs., 647 F.2d 218, 222 (1st Cir.
1981)).  It is the role of the Commissioner, not the courts, to
draw factual inferences, make credibility determinations, and
resolve conflicts in the evidence.  Id.  Complainants face a
difficult battle in challenging the Commissioner's determination
because, under the substantial evidence standard, the Court must
uphold the Commissioner's determination, "even if the record
arguably could justify a different conclusion, so long as it is
supported by substantial evidence." Rodriguez Pagan v. Secretary
of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987).

    **B.    Social Security Disability Standard**

    An individual is considered disabled if he is "[unable] to
engage in any substantial gainful activity by reason of any
medically determinable physical or mental impairment which can be
expected to result in death or which has lasted or can be
expected to last for a continuous period of not less than 12
months."  42 U.S.C. § 423(d)(1)(A).

    The Social Security Administration has promulgated a
five-step sequential analysis to determine whether a claimant is
disabled.  See 20 C.F.R. § 416.920.  The hearing officer must
determine: (1) whether the claimant is engaged in substantial
gainful activity; (2) whether the claimant has a severe

impairment; (3) whether the impairment meets or medically equals an impairment listed under 20 C.F.R. Part 404, Subpart P, Appendix 1, and meets the duration requirement; (4) whether the claimant has the residual functional capacity to perform his past relevant work; and (5) whether the impairment prevents the claimant from doing any other work considering the claimant's age, education, and work experience.  Id.

The claimant bears the burden in the first four steps to show that he is disabled within the meaning of the Social Security Act.  E.g., Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001).  Once the claimant has established that he is unable to return to his former employment, the burden shifts to the Commissioner to prove the fifth step, that the claimant is able to engage in substantial gainful activity that exists in significant numbers in the national economy.  Id.

## III. THE HEARING OFFICER'S DECISION

Applying the five-step analysis, the hearing officer, at the first step, found that Sastre has not engaged in substantial gainful activity since the alleged onset date of March 2, 2007. Admin. R. 12.  At the second step, the hearing officer found that Sastre's degenerative disc disease of the cervical and lumbar spines, degenerative disease of his right knee, and his hernia constituted "severe impairments" during the relevant time period. Id.  He further concluded, however, that Sastre's depression did

14

not amount to a severe impairment.  <u>Id.</u> at 13-14.  At the third

step, the hearing officer determined that the severe impairments

did not meet or medically equal any of the listed impairments in

20 C.F.R. Part 404, Subpart P, Appendix 1.  <u>Id.</u> at 14.

At the fourth step, the hearing officer found that Sastre

retained the residual functional capacity to perform light work,

noting that he was limited to frequent pushing or pulling and

occasional climbing, balancing, stooping, crouching, kneeling,

and crawling.  <u>Id.</u> at 14-18.  The hearing officer held that

Sastre could not perform past relevant work because the

exertional demands of the work exceeded his residual functional

capacity.  <u>Id.</u> at 18.  At the fifth step, the hearing officer

considered Sastre's age, education, work experience, and residual

functional capacity, and concluded that there are jobs that exist

in significant numbers in the national economy that Sastre can

perform.  <u>Id.</u>  These jobs include electronics assembler, cashier,

and fast food worker.  <u>Id.</u> at 19.  Following the five step

analysis, the hearing officer concluded that Sastre had not been

under a disability from March 2, 2007, to the date of the hearing

officer's decision.  <u>Id.</u>

## IV.  ANALYSIS

Sastre contests that the hearing officer committed

reversible error by ignoring Dr. Fuchs's opinion, improperly

discrediting Sastre's testimony, and by not finding Sastre's

depression to be a severe impairment.  Sastre Mem. 8, 17, 19.

## A.   The Weight Afforded to Dr. Fuchs's Opinion

Sastre argues that the hearing officer violated 20 C.F.R. §
416.927 and Social Security Ruling 96-6p by failing to consider
Dr. Fuchs's medical opinion.  Id. at 7.  Sastre further asserts
that this error was not harmless because had Dr. Fuchs's opinion
been adopted, a finding of disability would have resulted.  Id.
at 8.

"Medical opinions are statements from physicians and
psychologists or other acceptable medical sources that reflect
judgments about the nature and severity of [a claimant's]
impairment(s), including [] symptoms, diagnosis and prognosis,
what [a claimant] can still do despite impairment(s), and [any]
physical or mental restrictions."  20 C.F.R. § 416.927(a)(2).
When there are inconsistencies in the evidence, including the
medical opinions, the hearing officer is obligated to weigh all
the evidence.  Id. § 416.927(c)(2).

According to the Regulations, more weight should be given to
opinions from medical sources who have examined a claimant than
to opinions from nonexamining medical sources.  See id. §
416.927(d)(1).[2]  The regulations require the hearing officer to

_____

[2] Adopted in August 1991, these regulations codified the
treating physician rule and attempted to resolve a circuit split.
See 20 C.F.R. § 416.927(d). Prior to the adoption of these
regulations, the First Circuit had held that hearing officers
need not give greater weight to the opinions of treating

consider the opinions of State agency medical or psychological

consultants, but they are not bound by them.  <u>Id.</u> §§

---

physicians, <u>see</u> <u>Arroyo</u> v. <u>Secretary of Health & Human Servs.</u>, 932
F.2d 82, 89 (1st Cir. 1991), while the Second Circuit applied a
more stringent treating physician rule, <u>Schisler</u> v. <u>Sullivan</u>, 3
F.3d 563, 567-68 (2d Cir. 1993) (upholding 20 C.F.R. §
404.1527(d)) and noting it "accord[s] less deference to the
unsupported treating physician's than [prior Second Circuit]
decisions"). Although the Second Circuit now applies the updated
regulation, modern cases still incorporate older precedents that
put a heavy burden on the administrative officer to justify
rejecting the treating physician's diagnosis.  <u>See e.g.</u>, <u>Rosa</u> v.
<u>Callahan</u>, 168 F.3d 72, 78-79 (2d Cir. 1999).

In contrast, courts in the First Circuit seem to have
incorporated older precedents that minimize the treating
physician rule.  <u>E.g.</u>, <u>Shields</u> v. <u>Astrue</u>, No. 10-10234, 2011 WL
1233105, at *7 (D. Mass. Mar. 30, 2011) (Dein, M.J.) (citing
<u>Arroyo</u>, 932 F.2d at 89); <u>Haidas</u> v. <u>Astrue</u>, No. 08-11274, 2010 WL
1408618, at *3 (D. Mass. Mar. 31, 2010) (Wolf, J.) (citing
<u>Tremblay</u> v. <u>Secretary of Health & Human Servs.</u>, 676 F.2d 11, 13
(1st Cir. 1982)).

These pre-regulation circuit decisions thus appear to enjoy
a remarkable half-life, continuing to guide the district courts
in the several circuits notwithstanding express Social Security
regulations on the point.

The Court draws these insights from its service sitting in
designation in the Northern District of New York and handling
Social Security appeals pursuant to an innovative program under
the auspices of the Judicial Conference Committee on Intercircuit
Assignments.  The benefits of such intercircuit assignments can
hardly be overstated.  District Judges are experts in the
decisional law of the respective circuits for which we work.  We
have to be.  Intercircuit assignment allows the district judge to
"work" for another circuit.  As here, the results are frequently
eye-opening.  Indeed the continuing circuit disparity may well
explain the significantly greater rate of Social Security appeals
in the Northern District of New York.

So well does the process of intercircuit assignment work, in
fact, that one could readily imagine allocating Social Security
appeals among districts whose judges could handle them.  This
would markedly speed up the adjudicating process, broaden the
horizons of the participating judges, and contribute to the
development of a truly national law of Social Security
disability.

416.927(e)(2), 416.927(e)(2)(I).  The hearing officer, however,

must "explain in the decision the weight given to the opinions of

a State agency medical or psychological consultant . . . as the

[hearing officer] must do for any opinions from treating sources,

nontreating sources, and other nonexamining sources."  Id. §

416.927(e)(2)(ii); see also Social Security Ruling 96-8p, 1996 WL

374184, at *7 (noting residual functional capacity assessment

must include narrative discussion that considers and addresses

medical source opinions).

For the residual functional capacity assessment, the hearing

officer considered the opinion of state agency physician Dr.

Harrison and the medical records of Dr. Feliz's treatment of

Sastre.  See Admin. R. 16-18; cf. id. at 199-200 (including Dr.

Harrison's residual functional capacity assessment).  After

reviewing the medical evidence, the hearing officer concluded

that Sastre could perform work only in the light exertional

range.  Id. at 18.  He adopted Dr. Harrison's assessment that

Sastre had ability to stand or walk for six hours during an

eight-hour workday but failed to address Dr. Fuchs's two-hour a

day stand or walk assessment.  See id.  Here, the Court cannot

tell what weight the hearing officer accorded to Dr. Fuchs's

inconsistent opinion and how he resolved the inconsistency

between them.

As counsel for the Commissioner has conceded, the hearing

officer did not explain the weight afforded to Dr. Fuchs's more restrictive residual functional capacity assessment and his statement that he "accorded substantial weight" to both opinions is inconsistent with his decision to not adopt Dr. Fuch's assessment. See Comm'r Mem. 16. This Court recognizes that ignoring a state agency physician's opinion without explanation is an inexplicable error. See SSR 96-6p, 1996 WL 374180, at *1 (stating that hearing officers "may not ignore these opinions and must explain the weight given to the opinions in their decisions.").

The hearing officer here simply stated: "I have considered the administrative findings made by the state agency physicians . . . [and] accorded substantial weight in determining [Sastre's] residual functional capacity." Id. While, the Social Security Rulings state that hearing officers "are not bound by the findings made by State Agency or other program physicians." SSR 96-6p, 1996 WL 374180, at *2, they do require that the hearing officer consider the opinions and accord a certain weight to them. See id. In making his step-four determination, however, the hearing officer did not ignore Dr. Fuch's opinion. The hearing officer presented Dr. Fuchs's missing opinion evidence in a question to the vocational expert, Admin. R. 54-56, thus demonstrating that he considered the evidence even where it was missing from the narrative discussion.

Although the hearing officer was in error on this point, the error was harmless because the evidence supporting the hearing officer's determination is beyond just substantial evidence. The residual functional capacity assessment was supported by Dr. Harrison's opinion **plus** consistent medical treatment records by a treating physician, Dr. Feliz.

With regard to Sastre's large ventral hernia, he has not complained of any pain or functional limitations to any of his doctors since July 3, 2007. See id. at 241. Additionally, Sastre's neck and back pain appeared to have improved as a result of steroid treatment by Dr. Feliz over the period of November 2007 to July 2009. Id. at 455, 473-74, 482, 490. On May 22, 2008, Dr. Feliz noted that the examination of Sastre's lumbar spine showed there had been moderate improvment in the overall guarding, protecting, and limping. Id. at 482. On January 29, 2009, Dr. Feliz noted moderate improvement in Sastre's cervical spine examination and Sastre indicated that he felt improved by fifty percent. Id. at 473-75. Six months later on June 19, 2009, Dr. Feliz noted that Sastre's lower back pain was stable and that an examination of Sastre's lumbar spine showed significant improvement in the overall level of guarding, protecting, and limping. Id. at 455. Furthermore, Sastre's subjective complaints indicated improvement in his pain on January 14, 2009 and July 13, 2009. See id. at 449, 475.

While Dr. Feliz reported on July 13, 2009 that Sastre experienced a temporary period of partial disability from April 14, 2009 to July 13, 2009, he found at the time of the appointment that Sastre no longer had any physical disability that resulted from the car accident. Id. at 448-49. During this examination, Dr. Feliz encouraged Sastre to resume a normal level of physical activity and Sastre denied any significant knee, neck, or back pain. Id. at 448-49.

As discussed above, at the hearing on August 12, 2009, the hearing officer posed two hypothetical individuals to Dr. Scorzelli, the vocational expert. Id. at 54-55. When the hearing officer described a hypothetical individual that paralleled Dr. Fuchs's assessment of Sastre, Dr. Scorzelli testified that the individual would be more limited than an individual matching Dr. Harrison's assessment, but such an individual could still find work in significant numbers in the national economy. Id. at 55-56. Dr. Scorzelli noted that such jobs included work as a cashier, office clerk, and a security guard. Id. Accordingly, this Court holds that the hearing officer's residual functional capacity assessment is supported by substantial evidence.

Sastre further argues that Dr. Fuchs's residual functional capacity assessment must be accorded more weight than Dr. Harrison's because it was conducted over a year after Dr.

Harrison's assessment. Sastre Mem. 12. The Court, however, finds this argument to be unpersuasive, as Dr. Fuchs's opinion similarly predated the medical records and opinions from Sastre's treating physician, Dr. Feliz, who concluded in 2009 that Sastre had significantly improved. Compare id. at 449 with id. at 336-37.

Sastre also argues that the hearing officer violated Social Security Ruling 83-12 because under Dr. Fuchs's residual functional capacity assessment, Sastre's capacity falls between light and sedentary. Id. at 13-14. Following Sastre's reasoning, the outcome of his case would have changed had the hearing officer adopted Dr. Fuchs's assessment. While this Court recognizes that Social Security Ruling 83-12 would apply to Dr. Fuchs's assessment, the hearing officer was not bound by Dr. Fuchs's assessment. Ruling 83-12 does not require a finding of disability in such circumstances – it merely states that such an assessment could justify a finding of disabled. See SSR 83-12, 1983 WL 31253, at *2. Under the substantial evidence standard, the Court must uphold the Commissioner's determination, "even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Rodriguez, 819 F.2d at 3; see also Ortiz, 955 F.2d at 770 (noting where substantial evidence supports the agency, decision must be affirmed, even if substantial evidence arguably supports a different conclusion).

**B.   Assessment of Sastre's Credibility**

Sastre argues that the hearing officer violated Social Security Ruling 96-7p by failing adequately to consider Sastre's complaints of pain as credible testimony.  Sastre Mem. 17.  For a medically-determinable severe physical impairment that does not meet the requirements of 20 C.F.R. Part 404, Subpart P, Appendix 1, the hearing officer must consider the impact of the related symptoms, including pain, on the claimant's residual functional capacity.  See 20 C.F.R. § 416.929(d)(4); Avery v. Secretary of Health & Human Servs., 797 F.2d 19, 22-23 (1st Cir. 1986).  "The regulations recognize that a claimant's pain may be more severe than the objective medical evidence reflects."  Vega v. Astrue, No. 11-10406, 2012 U.S. Dist. LEXIS 44416, at *14 (D. Mass. Mar. 30, 2012).  The regulations provide six factors to consider when the claimant alleges pain or other symptoms that the First Circuit adopted in Avery, 797 F.2d at 26.  Thus, where a claimant alleges greater pain than the objective medical evidence suggests, the Avery factors require a hearing officer to evaluted:

> (1) The nature, location, onset, duration, frequency, radiation, and intensity of any pain; (2) Precipitating and aggravating factors (e.g., movement, activity, environmental conditions); (3) Type, dosage, effectiveness, and adverse side-effects of any pain medication; (4) Treatment, other than medication, for relief of pain; (5) Functional restrictions; and (6) The claimant's daily activities.

Id. at 29; Vega, 2012 U.S. Dist. LEXIS 44416, at * 16.  The

23

hearing officer must consider all of the claimant's reported symptoms, "including his subjective allegations of pain and its effect on his daily life and ability to work." Anderson v. Astrue, 682 F. Supp. 2d 89, 97 (D. Mass. 2010) (Gorton, J.) (citing 20 C.F.R. § 404.1529(a)).

Before a hearing officer may disregard a claimant's allegations of pain and specific symptoms, the hearing officer must articulate specific and adequate reasons for doing so. SSR No. 96-7p, 1996 WL 374186, at *4; Da Rosa v. Secretary of Health & Human Servs, 803 F.2d 24, 26 (1st Cir. 1986). A proper credibility determination is entitled to deference. Amaral v. Commissioner of Soc. Sec., 797 F. Supp. 2d 154, 162 (D. Mass. 2010) (citing Frustaglia v. Secretary of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987)).

In his written decision, the hearing officer specifically noted the evidence upon which he relied in coming to his conclusion. He first went through each Avery factor and addressed Sastre's subjective complaints. Admin. R. 15-16. He then highlighted the medical records of Sastre's treating physicians - which indicated his overall improvement and recommended that Sastre remain physically and mentally active - as the basis for his determination that Sastre's alleged restrictions had not been objectively quantified. Id. at 16. The hearing officer then noted that it weighed against Sastre's

credibility that he appeared to misrepresent his substance abuse and testified to helping repair automobiles during the period of alleged disability. Id. In sum, the hearing officer did not entirely discredit Sastre's testimony of pain, rather he found that Sastre's functional limitations were not credible in light of this evidence. Id.

The hearing officer next discussed the specific objective medical evidence that undercuts Sastre's allegations of high levels of pain or severe limitation. Id. at 17. With regards to Sastre's back and neck pain, he noted that Sastre was still working full-time in 1996 when a MRI examination revealed that he had degenerative disc disease and disc herniation of his lumbar spine. Id. Recent MRI examinations and clinical examinations by Dr. Feliz over the years showed degenerative disc with multiple facetal joint disease and moderate foraminal narrowing. Id. With the treatment of a series of facetal joint injections, however, Sastre's examinations were essentially normal until his symptoms were exacerbated by an automobile accident in April of 2009. Id.

On July 13, 2009, Dr. Feliz opined that Sastre was partially disabled from April 14, 2009 to July 13, 2009, but was no longer disabled and documented an increased level of physical activity with minimal pain and discomfort and mild residual stiffness. Id. The hearing officer also noted that Sastre's April 2009 MRI

revealed only early degenerative changes in his medial meniscus.
Id.

The hearing officer based his credibility determination on
the whole record.[3]  The hearing officer expressly considered
Sastre's testimony that he had difficulty with memory and
concentration, that he was in constant pain in which he rated an
eight out of ten on a visual analog scale, that all activities
exacerbate his symptoms, that he was prescribed several
medications which only provided short term relief, and that he
had difficulty lifting heavy objects, walking, and sleeping.  Id.
The hearing officer recognized that Sastre does likely experience
some difficulty in performing tasks; however, subjective claims
of pain may be disregarded if they are unsupported by objective
evidence.  See Mills v. Apfel, 244 F.3d 1, 7 (1st Cir. 2001).

Sastre essentially is asking this Court to reweigh the
evidence presented to the hearing officer.  Though a contrary
decision reasonably might have been reached in this case had
Sastre's testimony been credited, it is not the function of this
Court to second-guess credibility assessments of the hearing

---

[3] The hearing officer neglected to mention that on August 3,
2009, Sastre presented with severe back and neck pain that was
interfering with "any significant physical activity."  Id. at
479.  As an individual is only disabled when a medical impairment
lasts for a continuous period of twelve months, 42 U.S.C. §
423(d)(1)(A), and this appointment was just days before Sastre's
hearing, Admin. R. 21, this omission by the hearing officer is
not reversible error.

officer that are supported by sufficient evidence.  See

Rodriguez, 647 F.2d at 222.  Especially in a scenario where the

claimant bears the burden of proof, this Court will not disturb a

finding the hearing officer made while he was performing his

evidentiary duty.

   C.   **Severity of Sastre's Depression**

   Sastre also asserts that the hearing officer erred when he

determined, at step two, that Sastre's depression was not severe.

Sastre Mem. 19.  Sastre further asserts that the hearing officer

therefore erred by failing to consider the non-exertional

limitations caused by his alleged severe mental health symptoms.

Id. at 20.

   The First Circuit has stated that the step two severity

determination is a "de minimis policy, designed to do no more

than screen out groundless claims." McDonald v. Secretary of

Health & Human Servs., 795 F.2d 1118, 1124 (1st Cir. 1986).  "[A]

finding of 'non-severe' is only to be made where 'medical

evidence establishes only a slight abnormality or combination of

slight abnormalities which would have no more than a minimal

effect on an individual's ability to work . . . .'" Id. (quoting

Social Security Ruling 85-28, 1985 WL 56856, at *3).  At step

two, the claimant bears the burden of producing evidence that he

suffers from a severe medically determinable impairment.  See

Bowen v. Yuckert, 482 U.S. 137, 146 (1987); Freeman, 274 F.3d at

27

608.

> Once the existence of a medically determinable physical
> or mental impairment(s) that could reasonably be expected
> to produce the pain or other symptoms alleged has been
> established on the basis of medical signs and laboratory
> findings, allegations about the intensity and persistence
> of the symptoms must be considered with the objective
> medical abnormalities, and all other evidence in the case
> record, in evaluating the functionally limiting effects
> of the impairment(s).

SSR 96-4p, 1996 WL 374187, at *2.  "[I]f there is any uncertainty

in determining the effect of an impairment or combination of

impairments, the evaluation process should not end with Step 2."

Durant v. Chater, 906 F. Supp. 706, 711 (D. Mass. 1995) (citing

McDonald, 795 F.2d at 1124).

This issue is a close call.  Although medical evidence

demonstrates that Sastre has been clinically depressed,[4] Sastre,

through counsel, failed to identify limitations that arose from

his depression.  See Admin. R. 51-52.  The hearing officer

evaluated Sastre's depression by conducting a mental residual

functional capacity evaluation under the "B" and "C" criteria of

12.00, 12.04, and 12.06 in 20 C.F.R. Part 404, Subpart P,

Appendix 1.  Admin. R. 13-14.  The hearing officer evaluated

Sastre's activities of daily living, social functioning,

concentration, persistence, and pace, and episodes of

decompensation by reviewing the reports of the treating and

---

[4] More recent exams suggest that his depression responded
well to treatment.  Admin. R. 370-83.

28

consultative physicians, and Sastre's testimony at the hearing. Id. He concluded that Sastre's depression did not interfere with his ability to perform basic work and therefore was not a severe impairment under the Social Security Act. Id. at 14.

Upon evaluation of the record, this Court determines that there is substantial evidence, in the form of both treating and consulting physician reports, that indicates that Sastre's depression has not had a more than minimal effect on his ability to work since March 2, 2007. Cf. Rivera v. Astrue, 814 F. Supp. 2d 30, 34-35 (D. Mass. 2011) (affirming hearing officer decision that depression was not severe).

During his testimony at the hearing on August 12, 2009, Sastre did not mention depression when the hearing officer asked him to explain why he was disabled. See id. at 46 (claiming terrible neck and back pain, asthma, and arthritis). Nor did Sastre's counsel bring up depression at the hearing during his examination. Id. at 51-52. Medical evidence from multiple sources confirms a finding that although Sastre has experienced symptoms of depression, it was not a factor in his stated inability to work. On January 25, 2007, Dr. Paasche-Orlow stated that Sastre was depressed but blamed his asthma, allergies, hernia, and back pain for his inability to work. Id. at 274. On March 7, 2007, Dr. Paasche-Orlow noted that while Sastre was depressed, his judgment was intact. Id. at 268. Further, during

Dr. Feliz's examination of Sastre on April 17, 2007, he noted that Sastre had anxious feelings and depression.  Id. at 217. During that appointment and seven subsequent appointments, Dr. Feliz noted that Sastre's "mood and affect [was] appropriate to the situation."  Id. at 207, 215, 217, 483, 490, 495, 499, 502.

On July 3, 2007, Dr. Garcia performed a psychological consultative exam on Sastre and noted that he had experienced a mild depressive episode.  Id. at 242.  Dr. Garcia reported that Sastre's general functioning was diminished and estimated that his global assessment of functioning score was 40.  Id. at 242. He further noted that Sastre claimed to be out of work because his hernia caused him local pain.  Id. at 241.  Contrary to Sastre's assertion, Dr. Garcia did not report that Sastre had a passive death wish at the time of the appointment – Dr. Garcia reported that Sastre did not have one.  Id.  On July 24, 2007, Dr. Therese Harris opined that Sastre did not have a severe mental impairment and that his impairment was not expected to last twelve months.  Id. at 244.  Moreover, when Dr. Fuchs assessed examinations of Sastre from January 25, 2007, March 28, 2007, and October 10, 2007, he concluded that Sastre had only slight mental limitations which encompassed the ability to make judgments on simple work-related decisions, interact appropriately with supervisors and the public, and respond appropriately to work pressures in a usual work setting.  Id. at

368.

On February 27, 2009, Sastre reported to Dr. Trede that he was a "disaster." Id. at 386. During the same appointment, Dr. Trede diagnosed Sastre with severe depression. Id. at 390. During the subsequent follow-up appointments with Sastre, however, Dr. Trede noted that Sastre felt much better. Id. at 370, 375, 381. Finally, Sastre has never indicated that his depression was a contributing factor to his inability to work. See id. at 33, 241, 274, 304 (indicating exertional limitations as reasons for not working). Based on this evidence, the hearing officer could have concluded that Sastre had not had a mental impairment that more than slightly limited his ability to work for more than twelve months since March 2, 2007.

Lastly, Sastre argues that the hearing officer did not take these limitations into account when he evaluated his residual functional capacity in step four. Sastre Mem. 18. This Court does not condone the conclusory statements in the hearing officer's decision. Still, it is not much of a reach to conclude the hearing officer was considering Sastre's depression when he stated, "I have carefully reviewed all of the medical evidence, and conclude that the claimant's severe and nonsevere impairments, considered singly and in combination, only allow the claimant to perform work at the light exertional range." Id. at 18 (emphasis added); see Moss v. Astrue, No. 1:10-CV-054-JL, 2011

WL 1517988, at *17 (D. N.H. Apr. 21, 2011).

## V. CONCLUSION

For all the reasons stated above, this Court DENIES Sastre's motion for an order reversing the decision of the Commissioner, ECF No. 16, and GRANTS the Commissioner's motion to affirm the Commissioner's decision, ECF No. 19.  Judgment shall enter for the Commissioner.

SO ORDERED.


<u>  /s/ William G. Young    </u>
WILLIAM G. YOUNG
DISTRICT JUDGE